**IIN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Petitioner,**<br>**vs.**<br><br>**LATOYA HUGHES, Director, Illinois Department of Corrections,**<br><br>**Respondent.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No.** 3:26-cv-01074-DWD |

**MEMORANDUM & ORDER**

**DUGAN, District Judge:**

Before the court is the Petition of the United States (the "Government") to Enforce Two ICE Administrative Subpoenas. (Doc. 1). Respondent Latoya Hughes, sued in her official capacity as Director of the Illinois Department of Corrections ("IDOC"), opposes the Petition. (Doc. 15).[1] The Government replied (Doc. 18), and the Court heard argument on October 14, 2026 (Doc. 23). For the reasons given below, the Petition is **GRANTED**.

## I. BACKGROUND

U.S. Immigration and Customs Enforcement ("ICE") is investigating which individuals in IDOC custody, or on parole or mandatory supervised release ("MSR"), are removable from the United States. (Doc. 2-1, ¶ 8). According to Tyson Imming, the ICE deportation officer conducting that investigation, ICE cannot identify aliens who entered the United States without inspection solely by reference to its own databases, because the Department of Homeland Security has no record of them. (Doc. 2-1, ¶ 10). Officer Imming

---

[1] Because Director Hughes's brief presents IDOC's position, the Court refers to her arguments as IDOC's, as well.

explains that a foreign place of birth in a person's records serves as "a starting point for further database checks, interview and alienage determination." (Doc. 2-1, ¶ 15). He also explains that, based on aliens previously encountered in IDOC's populations, unlawfully present inmates and parolees who are absent from federal databases often lack a Social Security number ("SSN") or use one that belongs to someone else. (Doc. 2-1, ¶¶ 16–17).

On June 14, 2026, Officer Imming issued two subpoenas to Director Hughes on DHS Form I-138. (Doc. 2-1, ¶ 26). The first ("Subpoena 904") requests an Excel report of foreign-born individuals who are in IDOC custody or on parole or supervised release, requesting that the report include, among other data points, fields for birthplace, SSN, and citizenship. (Doc. 2-1, ¶ 27; Doc. 2-2). The second ("Subpoena 905") requests two Excel reports on IDOC's MSR and parole population. The first report would list releasees and parolees who lack SSNs, and the second report would list those who are foreign-born. (Doc. 2-1, ¶ 27; Doc. 2-2). Each subpoena required a single production of the requested records by July 10, 2026. (Doc. 2-1, ¶ 27). The "Title of Proceeding" entries on the I-138 forms name the requested IDOC reports. (Doc. 15, pg. 16; Doc. 2-2).

IDOC uses a commercial software called Offender 360 as its "official data system of record" for management of offenders in custody at IDOC facilities. (Doc. 15-2, ¶ 13). On a given offender's record in that system, place of birth is entered based on an individual's self-report during intake (when provided), and a "Foreign-Born" field is automatically populated based on the place of birth entry. IDOC does not verify the accuracy of either data point before entering the data. (Doc. 15-1, ¶¶ 40–47). SSNs are also self-reported and not required, and the SSN field is therefore left blank in "a significant

number" of records, including records of people that IDOC believes to be natural-born citizens who simply don't know their numbers at time of intake. (Doc. 15-1, ¶¶ 51–54). Offender 360 does not have a citizenship field. (Doc. 15-1, ¶ 37). It also does not currently give users the capability of generating an Excel report of foreign-born individuals. (Doc. 15-1, ¶ 48). IDOC's offender population is sizeable and experiences significant change on a monthly basis. In fiscal year 2026. IDOC admitted into custody an average of more than 1,500 people each month, and an average of about 1,400 people each month exited its facilities. (Doc. 15-1, ¶¶ 6–7).

On the return date of the subpoenas at issue, IDOC sent ICE an August 2025 report generated by an automated function that, as part of the system IDOC used prior to Offender 360, is no longer operational. It declined to compile any more recent data, asserting that the demand exceeded ICE's subpoena authority. (Doc. 15-1, ¶¶ 33–36). The Government has stated that ICE "anticipates issuing subpoenas for the information periodically, and perhaps monthly" (Doc. 1, ¶ 4), and the email transmitting the subpoenas referred to ICE's "compelling need to receive this information monthly" (Doc. 15-4). The Government now seeks an order directing Director Hughes to comply with the two subpoenas. (Doc. 1, ¶ 6; Doc 18, pg. 6). IDOC maintains that the demands exceed statutory authority, and contends that they also exceed constitutional limits. (Doc. 15).

## II. Legal Standards

Immigration officers may "require by subpoena . . . the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant

to the enforcement of this chapter and the administration of the Service." 8 U.S.C. § 1225(d)(4)(A). If the recipient neglects or refuses to respond, a district court "within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer" may order compliance, and failure to obey that order "may be punished by the court as contempt thereof." 8 U.S.C. § 1225(d)(4)(B). Officer Imming's investigation concerns IDOC facilities in this District. (Doc. 2-1, ¶ 8).

A court enforces an administrative subpoena when "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950); *accord EEOC v. Aerotek, Inc.*, 815 F.3d 328, 333 (7th Cir. 2016). The Seventh Circuit also requires that "the proper administrative procedures have been followed" and that "the subpoena does not demand information for an illegitimate purpose." *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 233 F.3d 981, 986 (7th Cir. 200). A court may not enforce an agency subpoena without finding that the material sought is relevant. *See EEOC v. United Air Lines, Inc.*, 287 F.3d 643, 653 (7th Cir. 2002). *Id.* at 653–54.

## III. Analysis

IDOC argues that court enforcement of these subpoenas is not appropriate, and raises six objections.

### A. ICE's Authority to Seek Records About Unidentified Subjects

IDOC first challenges ICE's authority. It argues that the Immigration and Nationality Act ("INA") does not authorize third-party subpoenas that are used to identify investigative targets where ICE does not yet know the targets' identities. (Doc.

15, pgs. 17–18, 22–25). IDOC relies on *Peters v. United States*, which held that the predecessor to § 1225(d)(4)(A) "does not authorize the INS to issue a blanket John Doe subpoena where the targets of a general investigation are unknown." 853 F.2d 692, 700 (9th Cir. 1988). The Ninth Circuit in *Peters* reasoned that Congress had expressly authorized the Internal Revenue Service to issue such summonses, subject to procedural safeguards, *see* 26 U.S.C. § 7609(f), but had given immigration officers no comparable authority. 853 F.2d at 697–99. IDOC adds that a district court in California applied *Peters* to deny enforcement of a Homeland Security Investigations subpoena issued to the head of a state agency, and that Congress has added no John Doe authority to the INA since *Peters* was decided in 1988. (Doc. 15, pgs. 17–18, 23–24 (citing *United States v. Baass*, No. 2:25-MC-00083-JLS-SSC, 2026 WL 898670 (C.D. Cal. Mar. 4, 2025))).

Section 1225(d)(4)(A), on its own terms, reaches records "concerning any matter which is material and relevant to the enforcement of this Act," where Act refers to the INA. Construing the same language in the statute's predecessor, the Supreme Court explained that this clause is not limited to questions of admission and deportation: "'Act' encompasses the full range of the subjects covered by the statute." *United States v. Minker*, 350 U.S. 179, 185 (1956). That range includes the INA's directives to DHS and ICE concerning aliens in criminal custody. Congress has directed the initiation of removal proceedings against aliens convicted of aggravated felonies "before the alien's release from incarceration for the underlying aggravated felony." 8 U.S.C. § 1228(a)(3)(A). It has directed that specified criminal aliens be taken into custody "when the alien is released, without regard to whether the alien is released on parole, supervised release, or

probation." 8 U.S.C. § 1226(c)(1). And it has directed the operation, under the authority of 8 U.S.C. § 1226(d), of a "criminal alien identification system" for "identifying and locating aliens who may be subject to removal by reason of their conviction of aggravated felonies, . . . not lawfully present in the United States, or otherwise removable." Violent Crime Enforcement Act of 1994, Pub. L. No. 103-322, § 130002(a), 108 Stat. 1796, 2023 (as amended) (codified at 8 U.S.C. § 1226 note). In short, ICE cannot fulfill its statutory mandate unless it begins by identifying which people fall into these statutes' categories.

These subpoenas seek records that are necessary for, and therefore relevant to, that determination. Officer Imming is investigating which members of IDOC's correctional population are removable, including persons absent from federal records, and the requested data fields enable him to conduct the work necessary to answer that question. (Doc. 2-1, ¶¶ 7–8, 10, 15–17, 21–23).

*Peters* does not require a different result. *Peters* held that the INA "does not authorize the INS to issue a blanket John Doe subpoena where the targets of a general investigation are unknown." 853 F.2d at 700. The Ninth Circuit drew that limit from *United States v. Bisceglia*, 420 U.S. 141 (1975), which upheld an IRS "John Doe" summons because Congress had directed the IRS to "inquire after and concerning all persons . . . who may be liable to pay any internal revenue tax." *Bisceglia*, 420 U.S. at 144, 149 (quoting 26 U.S.C. § 7601(a)); *see Peters*, 853 F.2d at 696–98. The IRS's John Doe authority, the court explained, was "firmly rooted in the language and policies of the revenue laws," while the INA reflected no comparable "language, authorization, safeguards, or policy underpinnings." *Peters*, 853 F.2d at 698. The investigation in Peters was therefore a general

one, since no statute tied the tenants of a farm-labor camp to any duty Congress had assigned the INS, and the agency chose that population on its own. *See id.* at 694, 698.

Here, Congress has chosen the population. Each of the congressional directives to DHS to target criminal aliens described above was enacted after *Peters* was decided, and together they are the INA's counterpart to § 7601. They require the government to inquire after a defined class of persons—removable aliens who are in, or are being released from, criminal custody—and the records of a state prison system and its parole and supervised-release population are where that class is found. These subpoenas seek those records to carry out those directives. The investigation they serve is therefore not an open-ended or general one, and *Peters* does not apply. Nor does the INA's lack of procedures like 26 U.S.C. § 7609(f) change that conclusion. Congress enacted § 7609(f) in 1976, after *Bisceglia*, to restrict an authority the IRS already possessed, *Peters*, 853 F.2d at 697–98, so the absence of a comparable restriction does not show the absence of the authority.[2] IDOC's reliance on *Baass*, which it describes as applying *Peters* (Doc. 15, pgs. 17–18, 23–24), fails for the same reasons.

---

[2] *Peters* involved an unrestricted dragnet for all records concerning a farm-labor camp's 150 resident families, rather than specified fields tied to the concrete criminal-alien identification duties discussed above. 853 F.2d at 693–94, 699–700; see also *QueerDoc, PLLC v. U.S. Dep't of Just.*, No. 25-7384, slip op. at 28 (9th Cir. Aug. 14, 2026) (explaining that targets' identities need not be known and that Peters rejected only an indefinite "'general investigation of unnamed individuals'") (citing *United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108, 1115 (9th Cir. 2012)). Moreover, even if it did apply here, *Peters* got the lesson of John Doe subpoenas and the tax code backward: in *Bisceglia*, 420 U.S. 141, 148–50 (1975), the Supreme Court held that general investigative language—like the INA's—inherently authorizes John Doe subpoenas without express statutory authorization or special safeguards. Congress then enacted 26 U.S.C. § 7609(f) a year later, not to grant that baseline power, but to cabin it in the tax context only. When Congress subsequently amended § 1225 without adding § 7609(f)-style restrictions, it preserved *Bisceglia*'s Supreme Court baseline rather than ratifying a single circuit's misreading of the effect of § 7609(f).

The Court therefore rejects IDOC's authority objection because Congress has directed ICE to identify and locate removable aliens in criminal custody and upon release. These subpoenas seek the records in which that class is found, and § 1225(d)(4)(A) therefore authorizes them even though ICE cannot yet name the individuals the records will identify.

### B. THE INVESTIGATION AND THE FORM OF THE SUBPOENAS

IDOC next argues that the subpoenas fail the requirements that an inquiry relate to an authorized investigation and that ICE follow its own procedures. (Doc. 15, pgs. 12–17). ICE's regulation authorizes subpoenas "for use in criminal or civil investigations" and for use in proceedings, 8 C.F.R. § 287.4(a)(1)-(2), and it provides that "[e]very subpoena issued under the provisions of this section shall state the title of the proceeding," *id.* § 287.4(b)(2). In IDOC's view, ICE seeks only leads for future investigations, so no current investigation exists, and the subpoenas' title entries name IDOC reports rather than any particular proceeding. (Doc. 15m pgs. 15–17).

An agency need not establish a violation before it investigates. It may "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Morton Salt*, 338 U.S. at 642–43. ICE's regulation provides separately for investigative subpoenas and subpoenas for proceedings. 8 C.F.R § 287.4(a)(1) authorizes subpoenas "requiring the production of records and evidence for use in criminal or civil investigations," and § 287.4(b)(1), headed "[c]riminal or civil investigations," prescribes their form without requiring them to state the title of a proceeding. The separate § 287.4(a)(2) authorizes subpoenas "for use in any proceeding," and § 287.4(b)(2), headed

"[p]roceedings other than naturalization proceedings," is the provision that contains the requirement that "[e]very subpoena issued under the provisions of this section shall state the title of the proceeding." 8 C.F.R. § 287.4(a)–(b).

Here, Officer Imming identifies a present inquiry (which members of IDOC's correctional population are removable) and the checks that ICE will perform in order to answer it. (Doc. 2-1, ¶¶ 8, 10, 15–17, 21–23). Generating leads advances that inquiry because the leads identify the people whose status ICE must examine. The subpoenas therefore seek records for an investigation, and § 287.4(a)(1) and (b)(1) govern them. Both subpoenas use Form I-138 and specify records sought and a return date. (Doc. 2-1 ¶¶ 26-27; Doc. 2-2). Although § 287.4(b)(2) refers to "[e]very subpoena," its requirement to state the title of "the proceeding" appears only in the paragraph governing proceedings, and the separate paragraph detailing the requirements for an investigative subpoena contains no such requirement. Applying the title requirement to these subpoenas would make the separate investigative procedure depend on the existence of a proceeding, and the structure of the regulation does not support the inference of such a dependency.

The Court therefore rejects this objection because Officer Imming's identified inquiry is the investigation the records serve, and the form requirements applicable to investigative subpoenas do not require the title of a separate proceeding.

### C. ICE's Intended Monthly Requests

IDOC next argues that ICE's announced plan to repeat these demands turns them into what IDOC describes as an "unauthorized monthly audit". (Doc. 15, pgs. 6, 14, 16–17). It points to the Government's statements that ICE "anticipates issuing subpoenas for

the information periodically, and perhaps monthly" (Doc. 1, ¶ 4) and has a "compelling need to receive this information monthly" (Doc. 15-4), and it emphasized that announced recurrence at argument. IDOC contrasts 26 U.S.C. § 6116, which requires the head of each state agency that administers prisons to provide specified inmate information to the Secretary of the Treasury every year, with the INA, which contains no comparable reporting duty. (Doc. 15, pg. 17).

Section 1225(d)(4)(B) permits enforcement of a subpoena "issued under this paragraph" after the recipient's "neglect or refusal to respond." The enforcement requirements then ask whether the demands exceed the agency's authority, are too indefinite, seek irrelevant information, impose an undue burden, or serve an illegitimate purpose. *Morton Salt*, 338 U.S. at 652; *United Air Lines*, 287 F.3d at 653; *Commodity Trend*, 233 F.3d at 986. IDOC does not identify where, in that analysis, consideration of hypothetical or future intended separate subpoenas belongs.

Only these two productions are properly before the Court. Each subpoena here commands one production. Neither requires recurring updates or gives ICE access to IDOC's database. (Doc. 2-1, ¶ 27; Doc. 2-2). Enforcing them therefore requires straightforward subpoena authority, which § 1225(d)(4)(A) supplies, rather than an authority to impose standing reports. Section 6116 imposes a standing annual reporting duty in a different statute, 26 U.S.C. § 6116(a), and the INA's lack of a comparable duty does not determine whether these two productions are valid under § 1225(d)(4). IDOC has not shown that the announced plan reflects an improper purpose, and the record does not show the burden of any actual series of demands. Thus, because it does not weigh on

any of the factors this Court must consider in an enforcement decision, the fact that ICE has indicated a potential need for future subpoenas does not weigh against enforcement of these subpoenas.

D. DIRECTOR HUGHES'S AMENABILITY TO ENFORCEMENT

IDOC next argues that § 1225(d)(4)(B), which authorizes an order "requiring such persons to . . . produce books, papers, and documents," does not reach a State. (Doc. 15, pgs. 18–21). It relies on the INA's definition of "person" as "an individual or an organization," 8 U.S.C. § 1101(b)(3); on the presumption that "person" excludes the sovereign, *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780 (2000); on the requirement that Congress make any alteration of the federal-state balance "unmistakably clear in the language of the statute," *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991); and on statutes that expressly include States among those subject to investigative demands, see 31 U.S.C. § 3733(l)(4). (Doc. 15, pgs. 19–21). Because Director Hughes is sued in her official capacity, IDOC contends that this proceeding is "no different from a suit against the State itself." (Doc. 15, pg. 19 n.4 (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989))).

A careful reading of *Will* itself answers that contention. The Supreme Court explained there that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" 491 U.S. at 71 n.10 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)). An order enforcing a subpoena is prospective relief of that kind. It directs the official who controls the records to produce them, and it

imposes no liability on the State. Federal courts accordingly treat state records custodians as subject to federal process. In *Ott v. City of Milwaukee*, the Seventh Circuit could identify no "established prerogative" of the Wisconsin Department of Corrections "that would be imperiled" by a federal subpoena, observing that the requesting party "could have demanded the same documents by issuing a subpoena to the correct employee in each agency" and that "[n]o state sovereign immunity issues are triggered by this subpoena because no ultimate relief is being sought from them." 682 F.3d 552, 556 (7th Cir. 2012); *see also Barnes v. Black*, 544 F.3d 807, 812 (7th Cir. 2008) (orders commanding a nonparty state official "to produce documents in the state's possession" "do not compromise state sovereignty to a significant degree"). The First Circuit rejected the same official-capacity argument in an administrative subpoena proceeding against a state official who controlled state records. *U.S. Dep't of Just. v. Ricco Jonas*, 24 F.4th 718, 726–28 (1st Cir. 2022).

The same is true here. Director Hughes controls the requested records, and the Government seeks their production for a federal investigation, not an adjudication of Illinois's liability. (Doc. 2-1, ¶ 26; Doc. 1, ¶ 6). The Court therefore need not decide whether Illinois itself is a "person" under the INA, and IDOC's statutory comparisons, which concern States as entities, do not bear on Director Hughes's obligation as custodian. Nor does an order compelling a custodian to produce existing records "upset the usual constitutional balance of federal and state powers" so as to trigger *Gregory*'s clear-statement rule. 501 U.S. at 460; *see Ott*, 682 F.3d at 556.

The Court therefore rejects this objection because an order directing Director Hughes, as the official who controls the requested records, to produce them is prospective relief against a state official rather than relief against Illinois, so Director Hughes is an "individual," and thus a "person," subject to an order under 8 U.S.C. §§ 1101(b)(3) and 1225(d)(4)(B).

### E. Burden of retrieving records and Commandeering

IDOC next argues that enforcement would commandeer state officers in violation of the Tenth Amendment. It contends that requiring IDOC personnel to search its database and create reports conscripts them into federal immigration enforcement, see *Printz v. United States*, 521 U.S. 898, 928, 933 (1997); that courts have rejected federal efforts to impose information-sharing obligations on States, see *United States v. California*, 921 F.3d 865, 876 (9th Cir. 2019); *United States v. Illinois*, 796 F. Supp. 3d 494, 522 (N.D. Ill. 2025); *United States v. Minnesota*, 2026 WL 2085701, at *15 (D. Minn. July 20, 2026); and that the canon of constitutional avoidance therefore requires a narrower reading of § 1225(d)(4), see *Clark v. Martinez*, 543 U.S. 371, 380–81 (2005). (Doc. 15, pgs. 21–22). IDOC adds that Offender 360 has no ready-made report containing every requested field, so compliance will require some work. (Doc. 15, pg. 12; Doc. 15-1, ¶¶ 35–36, 48–49).

The Tenth Amendment forbids the federal government to "command the States' officers . . . to administer or enforce a federal regulatory program." *Printz*, 521 U.S. at 935. The Brady Act provisions invalidated in *Printz* required local law-enforcement officers to "make a reasonable effort to ascertain" whether proposed handgun transfers were lawful, including by "research in whatever State and local recordkeeping systems are available."

*Id.* at 903. But *Printz* expressly did not reach federal laws that "require only the provision of information to the Federal Government." *Id.* at 918. And in *Reno v. Condon*, the Supreme Court held that a federal statute governing disclosure of information in state motor-vehicle records did not commandeer the States, because it merely regulated them "as the owners of data bases" and did "not require state officials to assist in the enforcement of federal statutes regulating private individuals," even though compliance would "require time and effort on the part of state employees." 528 U.S. 141, 150–51 (2000). The avoidance canon applies only when a statute is susceptible to more than one construction and one of them would raise serious constitutional problems. *Clark*, 543 U.S. at 380–81.

These subpoenas fall on the *Condon* side of that line. Section 1225(d)(4)(A) is not directed at States. It authorizes subpoenas to anyone who holds records concerning a matter material and relevant to the enforcement of the INA, and it reaches IDOC on the same terms as any other custodian. Like the statute in *Condon*, the subpoenas reach IDOC as the owner of a database. To comply, IDOC must retrieve the entries its records already contain for the listed fields—including birthplace, the automatically populated foreign-born indicator, and SSN—and transmit them in the requested format. (Doc. 2-2; Doc. 15-1, ¶¶ 40–47, 51). Searching a database and producing the results does not require the creation of a new document. *United States v. Woodfork*, No. 2:26-mc-00113-BSL-EJD, Doc. 56, pgs. 10–11 (E.D. La. May 11, 2026). Unlike the officers in *Printz*, IDOC personnel will not investigate anyone. They aren't being asked to decide whether anyone is removable, gather missing information, supply commentary, or verify what the records say. (Doc. 2-1, ¶¶ 15, 21–22). And each subpoena commands a single production, so this Order

imposes no continuing duty. (Doc. 2-2). The decisions IDOC cites addressed federal challenges to state laws that limit cooperation with immigration enforcement, not compulsory process served on a records custodian, and so they do not apply here. Because enforcement does not raise the problem *Printz* addresses, there is no serious constitutional question for a narrower construction to avoid. See *Clark*, 543 U.S. at 380–81.

IDOC's evidence that Offender 360 lacks a user-level function for generating the requested reports (Doc. 15-1, ¶ 48) does not change the result. IDOC does not identify or describe the retrieval effort that compliance would entail, so it has not carried its burden of showing an undue burden. See *United Air Lines*, 287 F.3d at 653–54.

The Court therefore rejects IDOC's commandeering and avoidance objections because § 1225(d)(4) reaches IDOC as a records custodian on the same terms as any other custodian, these subpoenas require only the production of existing data while leaving the investigative work to ICE, and the absence of a ready-made report does not, standing alone, establish an undue burden.

### F. RELIABILITY OF RECORDS, DUPLICATION OF RECORDS, AND THE BREADTH OF THE REQUESTS

Finally, IDOC challenges the relevance and breadth of the requested information. It argues that birthplace entries are unverified self-reports, that IDOC does not collect citizenship information, and that SSNs are optional and often blank, including for people IDOC believes are natural-born citizens. (Doc. 15, pgs. 8–9; Doc. 15-1, ¶¶ 37–54). It also argues that the information adds nothing meaningful to the fingerprints the FBI already

receives and to IDOC's public data sets, so the subpoenas would generate leads "from the unverified demographic data of thousands of unidentified people on the suspicion that some are violating immigration laws." (Doc. 15, pgs. 23 n.6, 25).

Section 1225(d)(4)(A) reaches documents "concerning any matter which is material and relevant to the enforcement of" the INA. The phrase "material and relevant" describes the matter under investigation, not each record sought. The records need only concern that matter under investigation. Here, the matter—which members of IDOC's custodial and supervised population are removable—is material and relevant to the enforcement of the INA's criminal-alien directives, *see* 8 U.S.C. §§ 1226(c)(1), 1228(a)(3)(A), so the question is whether the requested records are reasonably relevant to that inquiry. *See Morton Salt*, 338 U.S. at 652; *United Air Lines*, 287 F.3d at 653. The Government need not show more. Once it makes the required showing, IDOC bears the burden of showing that the demands are unreasonably broad. *United Air Lines*, 287 F.3d at 653.

The Government has made the required showing for the requested information about place-of-birth, as well as the identifying, custody, and release data. A foreign birthplace is "a starting point for further database checks, interview and alienage determination." The identifying fields permit ICE to match individuals against federal records. Custody and release information permits ICE to locate them, as Congress has directed. (Doc. 2-1, ¶¶ 7, 15–17, 21–22). ICE, not IDOC, will verify the information afterward. (Doc. 2-1, ¶¶ 15, 21–22). The sources IDOC identifies do not supply the same information: the FBI "cannot produce listings of foreign born inmates or parolees or of parolees lacking Social Security numbers" (Doc. 2-1, ¶ 23), and IDOC's public data sets

omit birthplace (Doc. 2, pg. 9; Doc. 15-1, ¶ 31). Thus, the records are not duplicative, but rather complementary to the records ICE can access through the means IDOC has identified.

The SSN report requested by Subpoena 905 requires a separate showing because it reaches parolees without a recorded SSN whether or not their records show a foreign birthplace. Officer Imming explains that unlawfully present inmates and parolees who are absent from federal databases often lack an SSN or use one belonging to someone else, based on aliens previously encountered in IDOC's populations, and that ICE cross-checks missing SSNs against birthplace and federal records. (Doc. 2-1, ¶¶ 16–17, 21–22). IDOC's evidence explains why many SSN entries are blank for innocent reasons. (Doc. 15-1, ¶¶ 51–54). Those explanations mean that a blank entry cannot, by itself, establish unlawful presence, but they do not eliminate its use as a screening lead for cross-checking within ICE's inquiry. The inclusion of citizens in this group therefore does not diminish or defeat its connection to the investigation as ICE has described it, and IDOC has not shown that the demand is unreasonably broad.

The Court therefore rejects IDOC's relevance and breadth objection because the requested entries permit identification, matching, and follow-up within ICE's stated removal inquiry, the requested documents are not duplicative of information ICE has or can access, and the information's imperfect reliability and inclusion of nonremovable persons do not negate those uses.

## IV. Conclusion

For these reasons, the Government's Petition to Enforce Two ICE Administrative Subpoenas (Doc. 1) is **GRANTED**. Respondent Latoya Hughes, in her official capacity as Director of the Illinois Department of Corrections, is **ORDERED** to comply with ICE Administrative Subpoena Nos. ERO-ENF-CHI-202600904 and ERO-ENF-CHI-202600905 (Doc. 2-2; see also Doc. 25) on or before **November 6, 2026** Director Hughes shall produce the reports described in the subpoenas' attachments, containing the fields those attachments list or incorporate, in the Excel format they specify, by the password-protected electronic transmission they specify or by another secure method to which the Government agrees. Failure to obey this Order may be punished as contempt. 8 U.S.C. § 1225(d)(4)(B).

**SO ORDERED.**

Dated: October 23, 2026

Judge Dugan

Digitally signed by Judge Dugan
Date: 2026.10.23 14:35:41 -05'00'

DAVID W. DUGAN
United States District Judge